## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **SANFORD J. ASMAN, an individual,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**ERIK DYKEMA, an individual,**<br>**KYLE ZELLER, an individual,**<br>**CASERAILS, an unincorporated fictitious**<br>**name used by Erik Dykema and Kyle**<br>**Zeller, and**<br>**DOCRAILS, INC., a Delaware corporation,**<br><br>**Defendants.** | **Civil Action No.**<br><br><br>**COMPLAINT**<br>**Trademark Infringement**<br>**Unfair Competition** |

## COMPLAINT

Plaintiff Sanford J. Asman ("Asman"), acting *pro se*, complains of Defendants Erik Dykema ("Dykema"), Kyle Zeller ("Zeller"), CaseRails, and Docrails, Inc. (collectively, "Defendants"), as follows:

### NATURE OF THE ACTION

1.      This is an action to remedy acts of, *inter alia*, federal and common law trademark infringement; false designation of origin and misrepresentation in commerce; false advertising; unfair competition; dilution; and misappropriation, all

caused by, *inter alia*, the defendant's infringement of Asman's federally registered "CaseWebs®", "CaseSpace®", and "CaseWorks Web®" trademarks ("the Asman Marks").

## PARTIES

### Plaintiff

2.      Asman is an individual, having an address of 570 Vinington Court, Atlanta, Georgia 30350.

### Defendants

3.      Defendant Erik Dykema ("Dykema") is an individual, and an attorney, having an address of 137 Varick Street, 2nd Floor, New York, New York 10013.  On his "LinkedIn" page (https://www.linkedin.com/profile/view?id=19133002&authType=NAME_SEARCH&authToken=osqy&locale=en_US&trk=tyah&trkInfo=clickedVertical%3Amynetwork%2Cidx%3A1-3-3%2CtarId%3A1432338722487%2Ctas%3Adykema), Dykema refers to himself as "CEO and Co-Founder at CaseRails".

4.      Defendant Kyle Zeller ("Zeller") is an individual, and an attorney, having an address of 137 Varick Street, 2nd Floor, New York, New York 10013.  On his LinkedIn page (https://www.linkedin.com/profile/view?id=55988888&authType=name&authToken

=WSBc&trk=prof-sb-browse_map-name), Zeller refers to himself as "COO & Co-Founder CaseRails".

5.      Defendant CaseRails, appears to be a fictitious business name adopted by Dykema and Zeller, has an address of 137 Varick Street, 2nd Floor, New York, New York 10013, the same being the address of Zeller and Dykema's law firm, Zeller IP Group PLLC.

6.      Defendant DocRails, Inc. is Delaware corporation, having a registered agent of VCorp Services, LLC, at 1811 Silverside Road, Wilmington, DE 19810-4345.   While DocRails' name does not appear in either the Solicitation Email (*See,* below) or on the CaseRails Website (http://www.caserails.com), it is present on the Denial Letter dated May 22, 2015 (*See,* below), whereby it appears that DocRails may be the real party in interest on behalf of Defendants.

## JURISDICTION AND VENUE

7.      This action arises under the federal Trademark Act, 15 U.S.C. §1051, *et seq*., and under related federal and state common law.

8.      This action is also based upon diversity, as the parties are residents of different states, *i.e.,* Asman is a Georgia resident, while Defendants Dykema and Zeller reside in New York, and Defendant DocRails is a Delaware corporation, and the amount in controversy exceeds $75,000.

9.      Subject matter jurisdiction over this action is conferred upon this Court by 15 U.S.C. § 1121 and 28 U.S.C. § 1338.  This Court has supplemental jurisdiction over the subject matter of Plaintiff's state and common law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is properly laid in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b), in that, on information and belief, Defendants transact business within this judicial district, and Defendants have committed the torts complained of herein within this judicial district.

11.     This Court has further personal jurisdiction over Defendants pursuant to O.C.G.A. § 9-10-91 in that Defendants have transacted, and continue to transact, business within the State of Georgia; Defendants have committed tortious acts or omissions within this state; Defendants have committed tortious injuries in this state; and Defendants regularly do and/or solicit business, and engage in other persistent courses of conduct, and derive substantial revenue from goods used or consumed or services rendered in this state.

## STATEMENT OF FACTS

### Plaintiff's Business and Plaintiff's Intellectual Property

12.     Asman is an attorney-at-law, and a member of the state bars of New York, New Jersey, and Georgia; a Registered Patent Attorney; and he is admitted, as a plenary member, to practice before the federal district courts for the Northern

District of New York, Southern District of New York, Eastern District of New York, District of New Jersey, Northern District of Georgia, Middle District of Georgia, Eastern District of Wisconsin, Western District of Wisconsin, and District of Colorado.  In addition, Asman has been admitted *pro hac vice* before several other district courts in which he has litigated.

13.     In connection with the foregoing court admissions, Asman, a sole practitioner, has handled dozens of intellectual property cases litigated in federal courts throughout the country, including more than two dozen such cases in the Atlanta Division of the Northern District of Georgia, alone.

14.     By way of further background, in addition to being a member of various bars, Asman has a degree in Computer Science from the Massachusetts Institute of Technology, where Asman also taught and worked on the research staff, doing computer related research for Project MAC.

15.     In the late 1970's microcomputers were introduced into the commercial marketplace, and Asman began combining his knowledge of computer programming with his legal practice by developing a series of software programs that ran on microcomputers.

16.     While Asman had built several microcomputers from components, Asman's first commercially purchased computer was a Radio Shack TRS-80, Model I, for which Asman wrote a word processing package.

17.     Asman used his computer experience to modify the TRS-80 Model I in order to enable it to display and store both upper and lower case letters (as the original TRS-80 Model I computers did not include adequate memory needed to display and store lower case letters).

18.     Asman used his computer and experience and engineering training to interface an IBM Selectric Computer Terminal/Printer to his TRS-80, whereby the combination of the modified TRS-80 Model I, the IBM Terminal, and Asman's software gave Asman the ability to create, retrieve, edit, and print "letter quality" documents, at a time when dedicated, stand-alone word processors costing tens of thousands of dollars were all that was commercially available for the production of such documents.

19.     Upon learning of Asman's success in creating and using a microcomputer as a business tool in his practice, attorneys from other firms approached Asman, who was then practicing law in New Jersey, and they requested that he set them up with similar systems for their own offices.

20.     As a result, Asman created a New Jersey corporation ("MBA") to market an "updated" and more reliable version of his system, in which a Radio Shack TRS-80 Model III microcomputer, a C. Itoh daisywheel printer, and Asman's software were used.  MBA marketed such systems for a number of years.

21.     Thus, Asman's first commercially available software product was a word processing package that enabled users, who were all attorneys, to generate, store, retrieve, modify, and print documents, including the ability to create form documents into which words, phrases, and other data could be merged.

22.     When the IBM PC was later introduced, in 1981, Asman's company began marketing IBM "clone" computers sold by Leading Edge Products, as it was still necessary, in the early 1980's to be able to sell a fully "integrated" system to law firms which, at the time, generally had no microcomputers, and lawyers generally insisted upon buying a fully "integrated" solution for their word processing needs.

23.     While MBA was successful in marketing such systems, it became clear that the real "profit" was in the software, rather than in the hardware.

24.     Accordingly, as more and more law firms acquired IBM-PC's and "clones", Asman decided to move away from the hardware side of the business and devote his efforts solely to writing and marketing legal application software.

25.     In that regard, Asman wrote software for use in his own legal practice, and to the extent that it appeared to be useful to him, to market it to others through MBA.

26.     Asman had handled many residential real estate closings, and he realized that the paperwork associated with the preparation of the HUD-1 Uniform Settlement Statement, the collection and retention of the various tax, water, sewer, etc. searches, and expenses, disbursements, etc. associated with handling residential real estate

transactions was so great that typical law firms handling real estate work generally had one or more "paralegals" who did nothing other than such work.

27.     Based on Asman's familiarity with computer software and real estate closings, Asman developed a piece of software called "***MBA RESPA***", where MBA was a reference to the company started by Asman, and RESPA was the acronym for the Real Estate Settlement Procedures Act of 1974, which created and mandated the use of the Uniform Settlement Statement called the HUD-1.

28.     ***MBA RESPA*** was a very popular piece of software with real estate firms, and it led to Asman writing and marketing other related software, including ***MBA Survey*** (which allowed one to "verify" a metes and bounds survey description), ***MBA Finance*** (which performed numerous financial calculations as well as providing mortgage amortization tables for a variety of loan types, etc.), and "***The 1099 Reporter***" which real estate attorneys used to collect and retain data from real estate transactions and report them annually to the IRS using magnetic media.

29.     From the foregoing experiences Asman confirmed that it was more profitable to remain solely in the software business than the hardware business, as hardware inventories were expensive, equipment became obsolete rapidly, and prices dropped over time, and as lawyers and law firms had generally embraced the use of microcomputers in their practice whereby it was no longer necessary to supply "turn-key" systems to law offices.

30.      While Asman continued to market **MBA RESPA**, **MBA Finance**, **MBA Survey**, and **The 1099 Reporter** into the 1990's, Asman learned that it was common for the very same real estate paralegals that "loved" **MBA RESPA** to surreptitiously "distribute" unlicensed copies to the paralegals with whom they dealt at other firms.

31.      Numerous calls for "support" from unlicensed parties caused Asman to realize that there was an inherent "piracy" problem in marketing software intended to be used on "desktop" computers and distributed on disk.

32.      As the IRS changed its reporting requirements annually, and as state real estate transfer taxes changed periodically, it was both necessary and desirable to create both "updates" and "enhancements" to the various software products being marketed by MBA.  Nevertheless, many law office licensees resisted the purchase of such updated and/or enhanced software, resulting in there being different versions of software being used by different law firms.

33.      Asman, in the interim, continued to write software for his own practice, including general ledger software, trust accounting software, and billing software, but he did not license that software to others at that time.

### *CaseWebs*®

34.      In around 2000, while litigating a case captioned *Iguana, LLC v. Realtree Outdoor Products, Inc., Outland Sports, Inc., Lohman Mfg. Co., Inc., Hunters Specialties, Inc., Wal-Mart Stores, Inc., Connecticut Valley Arms, Inc., Drury*

*Marketing, Inc., Rocky Shoes & Boots, Inc., and Bass Pro Outdoor World, L.P.*, Case No. 1:99-cv-810-CAP, it occurred to Asman that he could combine his legal training with his computer training to develop a web-based software system that would provide "24/7" access to all litigation being handled by Asman to Asman, his clients, co-counsel, and others, whereby once a document was scanned, and entered into the system, it would be available from any location with Internet access.  Asman developed such a system and called it "*CaseWebs*".

35.      *CaseWebs* was Asman's first effort at writing a web-based legal application, and it turned out to be both very useful, and very well received by clients, co-counsel, and others.

36.      Since the first version of *CaseWebs* was developed (ca. 2000) for use in the *Iguana v. Realtree, et als.* case, *CaseWebs* has been used in numerous cases, in both state and federal courts, and in courts outside of the United States, by Asman and other attorneys, as well as by clients, co-counsel, and others interested in following the progress of such cases.

37.      From the perspective of a law firm, *CaseWebs* provides numerous benefits relative to what is generally a "hodge podge" of different docketing and filing systems which vary from law firm to law firm and from case to case within any given law firm.

38.     In particular, *CaseWebs* provides a single, well-defined approach for handling litigation files, in that all physical documents are kept in loose-leaf view binders having, *inter alia*, a spine adapted to receive a printed slip.  The view binders used with *CaseWebs* are vinyl binders constructed with a clear pocket over the front cover, spine, and back cover on the outside. The pockets are open at the top to allow insertion of printed materials. Such view binders are universally available from office supply stores, and they are typically made to hold different capacities, with 2" and 3" binders being the binders of choice for use in connection with *CaseWebs*.

39.     Within the view binders, numbered index tabs (also generally available at legal supply sources and office supply stores) are used to retain documents, corresponding to the Pleadings, Correspondence, Discovery, and Miscellaneous items present in any given litigation.

40.     In addition to paper documents, the binders used with *CaseWebs* can retain other items, including such things as CD/DVD holders.

41.     The *CaseWebs* software not only keeps track of documents in cases, but it also keeps track of other items, in the form of computer readable files, including, *inter alia*, music, videos, and photographs, as well as any other type of computer readable file (PowerPoint presentations, spread sheets, .pdf files, etc.), whereby once entered into the *CaseWebs* system, and uploaded to the web-based secure servers used by *CaseWebs* such files are immediately available to any "user" who has been

assigned access codes (*i.e.,* generally the user's email address and a password) by the "Firm Administrator" of a law firm using ***CaseWebs***, with such accessibility as may be appropriate.  Thus, access to "confidential" documents can be easily restricted to only lawyers, law firm personnel, and the associated client, while access to non-confidential documents can be provided to other registered users who have been given access to a particular case, with all users having 24/7 access.

42.      In addition to being able to retain data about specific documents in a case, the ***CaseWebs*** database also includes data associated, *inter alia,* with users, lawyers, judges, judicial staff, court web sites, case events, etc.  Such data includes phone numbers, contact information, access to Local Rules, Court personnel, Electronic Filing (CM/ECF), etc.

43.      Thus, ***CaseWebs*** provides immediate access to all litigation related information using a single integrated system from a single web site, namely, http://www.casewebs.com.  Accordingly, ***CaseWebs*** has been called an "Integrated Case Information System".

44.      Further, since ***CaseWebs*** is web-based, it requires no installed software other than a standard browser and an installed .pdf reader, such as Adobe Acrobat Reader, to operate.  Thus, ***CaseWebs*** can be used on any operating system (*i.e.,* Microsoft Windows, Mac OS, Linux), with any browser (*i.e.,* Internet Explorer, Firefox, Google Chrome, Safari), and it can be used with any Internet enabled device

(*i.e.,* desktop computers, laptops, notebooks, netbooks, iPhones and Android based "smart phones", as well as iPads and other "tablets"), any of which provide immediate access to every case, document, user, lawyer, court, and court personnel, all using a very simple, intuitive, user friendly interface, with no need to transfer files or take any action other than logging in to the ***CaseWebs*** web site.  Using ***CaseWebs*** makes losing files, dragging boxes from the office to the home, misplacing documents, creating multiple copies of documents for those needing access, etc. all things of the past.

45.      In addition to the foregoing, ***CaseWebs*** uses a standardized system for providing a dynamically produced .pdf file for creating the "CaseSpine" insert for the aforementioned view binders, whereby each CaseSpine insert provides, at a glance, the court name, case caption, case number, judge and judicial staff information, a list of attorneys in the case (along with their phone numbers), and a "CaseLogo" which is a visual design (*i.e.,* a photo, trademark of a party, etc.) which makes it trivial to find a case binder, as the "CaseLogo" is also present on the web page associated with each particular matter.

46.      In connection with the generation of the CaseSpine, as well as the generation of the various web pages produced by ***CaseWebs***, a "form" document is populated with data from an integrated database, whereby the ***CaseWebs*** software can be considered to be document creation software.

47.     For the reasons expressed above as well as for other reasons associated with features that have not been described, *CaseWebs* has developed, over the past fifteen years, into an extremely useful and reliable tool for use by lawyers, law firms, and their clients.

48.     While the view binders used for retaining physical documents have been described, in fact, it is rarely necessary to access the physical documents, as most litigators tend to have computers on their desktops (or notebooks, smart phones, tablets, etc.) whereby everything about all of their past and current cases is at their fingertips, all in a "paperless" environment which is accessible from wherever they happen to have Internet access.

49.     Notwithstanding the foregoing, there are courts in which Asman has practiced (*e.g.,* the U.S. District Court for the Southern District of New York) that do not permit attorneys to bring computers into their courtrooms, and there are courts (*e.g.,* the U.S. District Court for the District of Massachusetts) in which computer use is permitted but in which Wi-Fi is unavailable and in which the shielding of the building prevents the use of cellular based access to the Internet, whereby the *CaseWebs* view binders are necessary for courtroom use.

50.     While an overview of *CaseWebs* has been generally described above, *CaseWebs* actually includes many more features that allow a lawyer using *CaseWebs* to readily add documents to an existing matter.  Thus, in federal litigation, when an

- 14 -

attorney receives the CM/ECF filing notice by email, it only takes a few steps to "cut and paste" the docket text into *CaseWebs*, download the file from the CM/ECF server, enter the file into *CaseWebs*, and cause *CaseWebs* to issue automated emails to all users having access to the particular matter.

51.     Other uses of *CaseWebs* include the ability to have "local counsel" or "co-counsel" who are hundreds or thousands of miles apart, with each having full access to the identical file in a matter of seconds without making copies, sending faxes, or doing anything other than giving them appropriate user access to a matter.

52.     In situations in which discovery entails providing opposing counsel with documents from other matters, such access can be provided in seconds without any duplication, shipping, delay, or expense.  As such, *CaseWebs* has proven its ability to save substantial time and money for litigators who are often called upon to duplicate documents from other cases, particularly since a litigator can honestly represent to a Court that by giving opposing counsel access to *CaseWebs*, such opposing counsel is being provided with both immediate and *identical* access that the party has.

53.     Once it became apparent to Asman that *CaseWebs* was providing a significant benefit to his practice and to his clients (who no longer needed to contact Asman to keep up-to-date with their respective matters, who were no longer being billed for time associated with merely finding out and tracking their litigation matters, and who were never frustrated by getting voicemail or waiting for a return

phone call or email when they simply wanted to know what was going on in their matter), and once Asman realized that *CaseWebs* provided a wholly different paradigm to attorneys, as they now had 24/7 access to all of their litigation files from anywhere, including such places as airports, Wi-Fi equipped airliners, cruise ships, foreign countries, etc. while simultaneously providing password protected secure web-servers rather than having to carry around files which had to be repeatedly copied, etc., Asman realized that *CaseWebs* could be further commercialized as a product that could be used, and licensed, by other lawyers and firms, thereby opening up a market greater than that which was present within Asman's own client base and those lawyers with whom Asman associated in particular cases.

54.     Following the successful deployment of *CaseWebs* for use by Asman, his clients, and others, Asman decided to rewrite *CaseWebs* so that it could be used by, and licensed to, other firms and marketed on a subscription basis

55.     On October 23, 2007, Asman received U.S. Trademark Reg. No. 3,316,614 ("the '614 Registration") in which the mark *CaseWebs*® was registered on the Principal Register of the United States Patent and Trademark Office.  A true copy of the '614 Registration is attached hereto as Exhibit 1.

56.     The *CaseWebs*® registration was granted "incontestable" status pursuant to Section 15 of the Trademark Act on November 15, 2012, whereby the *CaseWebs*® mark is a very strong mark.

***CaseSpace*®**

57.     As set forth above, Asman has a long history of having written legal application software for his own legal practice as well as for licensing to others.

58.     As a practicing attorney, Asman realized was that it was extremely important to avoid the common practice of having different pieces of software handling different, but related, tasks.  Thus, while it is common in law offices to use software such as Microsoft Outlook to retain client contact information, while using something like TimeSlips for billing, and some other software (*i.e.,* Excel or even Word) to maintain docket lists, etc., such actions led to numerous problems of inconsistent data entered into different pieces of software.

59.     Asman realized that the use of multiple, independent pieces of software, each with its own database, inevitably led to inconsistencies.  For example, if a client moved or changed contact information (*i.e.,* an address, phone number, email, or personnel change), such change might be reflected in the Microsoft Outlook file, but not in the billing software.  Similarly, if the title of a matter changed, such change might be made in the docketing software, but not in the billing software.  Asman realized that such inconsistencies abound in the practice of law when different software, each having its own database, is used.

60.     Based upon the foregoing, Asman incorporated what he considers to be one of the "truths" of life, *i.e.,* "It is better to be wrong than inconsistent." into a desktop

based legal practice legal application he had written to "integrate" the functions of client contact, matter management, docketing, and billing, whereby data resided in a single database, thereby providing a fully integrated legal system for all purposes other than those which were the subject of *CaseWebs*.

61.     Asman developed the aforementioned desktop software and called it "LegalNET".  LegalNET was able to integrate into a single piece of software a variety of functions, including (but not limited to), client contact, file maintenance, docketing, billing, and document creation.

62.     The document creation capabilities of LegalNET, made it possible to create legal form documents and to then populate those documents with data from the database that was included as a part of LegalNET.

63.     In addition to the incorporation of data from the existing database of LegalNET, LegalNET also had the unique capability of adding "fields", not otherwise already in the LegalNET database, using a technology known as XML, whereby form documents could be created by a user who then had the ability to add new fields (*i.e.,* fields not already in the LegalNET database) to those documents by creating an XML database and without requiring any changes to the LegalNET software and without the user having any knowledge of computer programming or database use.

64.     The document creation capability of LegalNET resulted in the creation of complete, editable Microsoft Word documents.

65.     While LegalNET was fully workable, Asman realized that it suffered from a number of shortcomings as it worked only on a single computer that had to be running under the Microsoft Windows operating system, and that computer had to have the correct version of the Microsoft .Net Framework installed.  Further, if a user wanted to use LegalNET on another computer it was necessary to copy the database from the first computer to the second computer, as the database was "local" to the computer on which it was created.

66.     While Asman considered marketing LegalNET, such thoughts were highly tempered by Asman's prior experiences with licensing desktop software, including the support and piracy issues mentioned above.

67.     One attorney who was aware of Asman's LegalNET software and who wanted to see it operate was local counsel to Asman in a matter that Asman was then handling in the U.S. District Court for the Southern District of Florida.  Asman's local counsel asked Asman to demonstrate LegalNET to him when Asman was next in Miami in connection with that case.

68.     In anticipation of that meeting, which coincided with a trip to Miami, Florida relating to the District Court litigation, Asman copied the LegalNET software from his desktop computer to a newly acquired notebook computer that Asman

brought with him to Miami for the express purpose of showing and demonstrating

the LegalNET software to his Miami co-counsel.  To Asman's great surprise,

embarrassment, and chagrin, when he attempted to start the LegalNET software it

would not initialize or work, so no demonstration took place.

69.      Upon returning to Atlanta, Asman realized that, unlike his prior notebook,

on which LegalNET worked perfectly, the new notebook computer used a 64-bit

processor, whereas the software on which LegalNET had been developed used a

32-bit processor, whereby the "kernel" in the Microsoft .Net framework (used in the

LegalNET software) had to be substituted.  Upon substitution of the proper kernel

LegalNET worked perfectly on the new notebook.  Nevertheless, Asman realized

that with some lawyers using 32-bit systems, others using 64-bit systems, others

having some mix, and most not even knowing there was a difference, support issues

with respect to the stand-alone system would be substantial.

70.      Upon reflection, Asman realized that the best way to address both the

support and other issues inherent with LegalNET would be to rewrite it as a

web-based system.

71.      Asman thereafter wrote a new web-based system that included virtually all

of the underlying features of LegalNET, while adding numerous other features, such

as "paperless" files and trust accounting, and he added other features available only

to web-based systems, *i.e.,* the ability to link to other sites and to give clients access to their own files.

72.     Asman named his newly developed web-based fully integrated legal system "*CaseSpace*".

73.     Like *CaseWebs*® before it, *CaseSpace*® was also considered to be an "integrated" system.

74.     Asman applied for a federal registration for the mark "*CaseSpace*" on July 10, 2008, and U.S. Trademark Reg. No. 3,575,917 ("the '917 Registration"), a true copy of which is attached as Exhibit 2, was registered on the Principal Register of the U.S. Patent and Trademark Office on February 17, 2009.

75.     The *CaseSpace*® registration was granted "incontestable" status pursuant to Section 15 of the Trademark Act on March 8, 2014, whereby the *CaseSpace*® mark is a very strong mark.

### *CaseWorks Web*®

76.     In, or around December 2009, Asman became aware that a company named Integrated Imaging, LLC ("Integrated") had filed U.S. trademark application Ser. No. 7789579 seeking federal registration for the mark "CaseWorks Web" for use in connection with a web-based "case management" system.

77.     Upon learning of that trademark application Asman immediately objected to the use of a "Case" formative mark in connection with a web-based "case management" system.

78.     When such objections went unheeded by Integrated, Asman filed suit against Integrated in a case style *Sanford J. Asman v. Integrated Imaging, LLC,* filed in the U.S. District Court, Northern District of Georgia, as Case No. 1-11-cv-4206-RWS.

79.     After consulting with three separate law firms, Integrated realized that Asman's superior rights to web-based legal software using a mark including the word "Case", were far superior to Integrated's newly claimed right to use the "CaseWorks Web" mark, which was the subject of Opposition Proceeding No. 91200535 then pending before the Trademark Trial and Appeal Board of the United States Patent and Trademark Office.

80.     The foregoing case resulted in a final Order recognizing Asman's superior rights and title to "Case" formative marks used on web-based legal application software, and a final permanent injunction in Asman's favor, a true copy of which is set forth in Exhibit 3.

81.     All claimed rights of Integrated in the "CaseWorks Web" mark, together with the then pending application seeking registration of the "CaseWorks Web" mark were transferred to Asman, who then withdrew the Opposition (as he was now

both the Opposer and the Applicant), and Asman completed the application seeking registration of the "*CaseWorks Web*®" mark, and it was registered to Asman as U.S. Reg. No. 4,144,587 on May 22, 2012, a true copy of which is annexed as Exhibit 4.

## Rails

82.     Asman's LegalNET desktop software and the original web-based version of *CaseWebs*® were written using Microsoft's ".NET" framework.

83.     Due to the amount of development work that was required to rewrite LegalNET, Asman decided to switch development from Microsoft's ".NET" framework to a newer technology using the Ruby language, and a framework named "Rails".

84.     The use of the Rails framework together with the Ruby language offered a well-documented, open source platform that provides for a relatively easy way to generate web-based enterprise level applications having very strong backend database support.

85.     The combination of the Ruby language and Rails framework has become known as "Ruby on Rails", or simply, "Rails".  Thus, web-based applications using the Ruby language and Rails framework are generally referred to as "Rails" applications.

## The Internet Domains

86.      In addition to ownership of the "*CaseWebs*®", "*CaseSpace*®", and "*CaseWorks Web*®" marks, Asman also owns the Internet domains "casewebs.com", "casespace.com", and "caseworksweb.com".

87.      Asman's ownership of the foregoing federally registered marks, along with the foregoing internet domains demonstrates a strong ownership interest by Asman of web-based legal applications using "Case" formative marks.

88.      As set forth above, both the "*CaseWebs*®" and "*CaseSpace*®" applications were developed using the "Ruby on Rails" framework, whereby they are both recognized to be "Rails" applications.

89.      In fact, while Asman's "*CaseSpace*®" application can be accessed at http://www.casespace.com it can also be accessed at http://asman.railsplayground.net, wherein "**rails**playground.net" is a domain used to host "Rails" applications on the Internet.

90.      Similarly, while Asman's "*CaseWebs*®" application can be accessed at http://www.casewebs.com, it can also be accessed at http://casewebs.asman.railsplayground.net.

91.      It is clear that use of the word "Rails" in connection with a web-based legal application also using the word "Case" by anyone other than Asman implicates an extremely high likelihood of confusion with Asman's marks and web-based legal application software.

## The Defendant's Activities

92.     On or about May 8, 2015, Asman, an attorney, received an unsolicited commercial email ("Solicitation Email"), a true copy of which is annexed hereto as Exhibit 5.

93.     As set forth in the Solicitation Email, Erik Dykema ("Dykema"), who identified himself as CEO of an entity called "CaseRails", was promoting web-based document creation software, also called "CaseRails", to attorneys, particularly those involved in Trademark, Litigation, and Corporate law, the same being among the identical legal areas addressed by Asman's ./ "*CaseWebs*®" and "*CaseSpace*®" web-based legal software.

94.     Upon receipt of the Solicitation Email, Asman telephoned Dykema and voiced objection to the use of the mark "CaseRails" for web-based legal software, such objection being based on Asman's prior, long-standing rights to web-based legal application software using the word "Case" as part of their mark.

95.     Asman also pointed out that Asman's own software was, in fact, "Rails" software.

96.     Thereafter, Asman viewed the caserails.com website where Asman learned that another attorney, Kyle Zeller ("Zeller"), was also a principal in CaseRails

97.     Asman spoke with Zeller, as well, again voicing the same objections.

98.     Following the foregoing conversations, Asman sought to determine the name of the legal entity that was "behind" CaseRails.

99.     To his surprise, a careful review of the CaseRails website, showed no reference to any entity other than "CaseRails", while the records of the Secretaries of State of both New York and Delaware disclosed no legal entity named CaseRails formed as either a corporation or as a limited liability company.

100.    Following such review, Asman sent a "cease and desist" letter, a true copy of which is annexed hereto as Exhibit 6, to both Dykema and Zeller.

101.    As set forth therein the cease and desist letter (Exhibit 6) demanded a response by the close of business on May 22, 2015.

102.    On May 22, 2015 Asman received an email from Dykema that included a letter on the letterhead of "RailDocs, Inc.", an entity that was not identified in either the Solicitation Email (Exhibit 5) or on the CaseRails Website.  The letter ("Refusal Letter"), a true copy of which is annexed hereto as Exhibit 7, stated that Defendants would not honor Asman's trademark rights.

103.    Notwithstanding their actual notice of Asman's trademark rights, along with the constructive notice provided by Asman's federal registrations (*See,* Exhibits 1, 2, and 4) pursuant to 15 U.S.C. § 1072, Defendants' Refusal Letter (Exhibit 7) stated that they will continue to use the infringing "CaseRails" mark, along with the web site and domain "caserails.com".

104.     Notably, while the name DocRails, Inc. did not appear in the Solicitation Email (Exhibit 3) or anywhere on the CaseRails Website, it does appear on the Refusal Letter, whereby it is named as one of the Defendants herein.

105.     The foregoing "CaseRails" mark and its use is likely to cause confusion with the Asman Marks, particularly since Asman has used his "Case" formative marks and identified his legal software as having been written in "Rails" for a period of time that extends far prior to any adoption of the "CaseRails" mark or website by Defendants.

106.     Defendants have falsely claimed that their use of the infringing "CaseRails" mark is not likely to cause confusion, as Defendant's software includes the ability to create legal documents.

107.     Notwithstanding their false claims, Asman developed legal application software capable of generating legal documents as far back as the 1970's, not only long before the Defendants created such software, but likely before they were even born.

108.     Asman's own LegalNET software incorporated legal document preparation capabilities long prior to any such use by Defendants.

109.     Asman's *CaseWebs*® software has been able to generate numerous legal documents, including, but not limited to Summonses and Subpoenas for periods extending long prior to Defendants' use of the infringing "CaseRails" mark.

110.     In addition to the foregoing, the Asman Marks are used in connection with web-based legal application software, and due to Asman's prior development of software that has document creation capabilities, such capabilities are well within the scope of reasonable expansion by Asman into additional web-based legal applications, whereby any use of a "Case" formative mark by Defendants is likely to cause confusion as to the origin, quality, and sponsorship of such software.

111.     While Asman does not know the name and industry of every party who uses the software covered by the Asman Marks, the channels of trade and the actual and prospective customers for Asman's software overlap with those parties to whom Defendant is promoting its own software under the infringing "CaseRails" mark.

112.     Since a time well before Defendants began using the "CaseRails" mark or the "caserails.com" URL, Asman has used, and has continued to use, the Asman marks and the "casewebs.com", "casespace.com", "asman.railsplayground.net", and "casewebs.asman.railsplayground.net" URLs.

### First Cause of Action
### Federal Trademark Infringement in Violation of 15 USC §1114 and §1117
### ("CaseWebs®") U.S. Reg. No. 3,316,614)

113.     Plaintiff hereby repeats each and every allegation contained in each of the foregoing paragraphs of this Complaint as though fully set forth herein.

114.     Asman is the owner of U.S. Reg. No. 3,316,614, registered October 23, 2007 for the mark "CaseWebs®" for web-based legal software.  *See,* Exhibit 1.

115.     The use in commerce by Defendants of the mark "CaseRails" is confusingly similar to Asman's federally registered "CaseWebs®" mark, particularly in view of the fact that Asman's "CaseWebs®" software is written in Rails and the URL associated with Asman's "CaseWebs®" software includes the word "rails".

116.     Such use is and has been without the consent of Asman, the registrant of U.S. Reg. No. 3,316,614 (Exhibit 1) in violation of 15 U.S.C. §§ 1114 and 1117.

117.     The aforesaid use by Defendants of the "CaseRails" mark is a colorable imitation, counterfeit, copy, and/or confusingly similar to Asman's "CaseWebs" mark, by Defendants, and such use is likely to cause confusion, or to cause mistake, or to deceive customers of Asman, potential customers of Asman, and others seeking software from Asman, in violation of 15 U.S.C. §§ 1114 and 1117, and such use has, and will continue to cause such confusion until terminated.

118.     Defendants have been under constructive notice of Asman's "CaseWebs®" mark since its registration, pursuant to 15 U.S.C. § 1072.

119.     Asman placed Defendants on formal notice of his ownership of the foregoing "CaseWebs" mark and U.S. Reg. No. 3,316,614 (Exhibit 1) at least as early as May 8, 2015, by email including the cease and desist letter (Exhibit 6) directed to Defendants Dykema and Zeller, both of whom are attorneys.

120.     Notwithstanding both constructive and actual notice of the Asman Marks, Defendant has continued to offer its web-based software in commerce using the

infringing "CaseRails" mark, and they will continue to do so until enjoined by this court.

**Second Cause of Action**
**Federal Trademark Infringement in Violation of 15 USC §1114 and §1117**
**("CaseSpace®" U.S. Reg. No. 3,575,917)**

121.     Plaintiff hereby repeats each and every allegation contained in each of the foregoing paragraphs of this Complaint as though fully set forth herein.

122.     Asman is the owner of U.S. Reg. No. 3,575,917, registered February 17, 2009 for the mark "CaseSpace®".

123.     The use in commerce by Defendants of the marks "CaseRails" is confusingly similar to Asman's federally registered "CaseSpace®" mark, particularly in view of the fact that Asman's "CaseSpace®" software is written using Rails and the URL associated with Asman's "CaseSpace®" software includes the word "rails".

124.     Such use is and has been without the consent of Asman, the registrant of U.S. Reg. No. 3,575,917 (Exhibit 2 in violation of 15 U.S.C. §§ 1114 and 1117.

125.     The aforesaid uses in commerce by Defendant's use of the "CaseRails" mark is a colorable imitation, counterfeit, copy, and/or confusingly similar to Asman's "CaseSpace®" mark, by Defendants, and such use is likely to cause confusion, or to cause mistake, or to deceive customers of Asman, potential customers of Asman, and others seeking software from Asman, in violation of 15

U.S.C. §§ 1114 and 1117, and such use has, and will continue to cause such confusion until terminated.

126.    Defendants have been under constructive notice of Asman's "CaseSpace®" mark since its registration, pursuant to 15 U.S.C. § 1072.

127.    Asman placed Defendants on formal notice of his ownership of the foregoing "CaseSpace®" mark and U.S. Reg. No. 3,575,917 (Exhibit 2) at least as early as May 8, 2015, by emails and letters directed to Defendants, a true copy of which is attached as Exhibit 6, hereto.

128.    Notwithstanding both constructing and actual notice of the Asman Marks, Defendants have continued to offer their goods and services in commerce using the infringing "CaseRails" mark, and they will continue to do so until enjoined by this court.

### Third Cause of Action
### Federal Trademark Infringement in Violation of 15 USC §1114 and §1117
### ("CaseWorks Web®" U.S. Reg. No. 4,144,587)

129.    Plaintiff hereby repeats each and every allegation contained in each of the foregoing paragraphs of this Complaint as though fully set forth herein.

130.    Asman is the owner of U.S. Reg. No. 4,144,587, registered May 22, 2012 for the mark "CaseWorks Web®".

131.    The use in commerce by Defendants of the marks "CaseRails" is confusingly similar to Asman's federally registered "CaseWorks Web®" mark.

132.    Such use is and has been without the consent of Asman, the registrant of U.S. Reg. No. 4,144,587 (Exhibit 4 in violation of 15 U.S.C. §§ 1114 and 1117.

133.    The aforesaid uses in commerce by Defendant's use of the "CaseRails" mark is a colorable imitation, counterfeit, copy, and/or confusingly similar to Asman's "CaseSpace®" mark, by Defendants, and such use is likely to cause confusion, or to cause mistake, or to deceive customers of Asman, potential customers of Asman, and others seeking software from Asman, in violation of 15 U.S.C. §§ 1114 and 1117, and such use has, and will continue to cause such confusion until terminated.

134.    Defendants have been under constructive notice of Asman's "CaseWorks Web®" mark since its registration, pursuant to 15 U.S.C. § 1072.

135.    Asman placed Defendants on formal notice of his ownership of the foregoing "CaseWorks Web®" mark and U.S. Reg. No. 4,144,587 (Exhibit 4) at least as early as May 8, 2015, by emails and letters directed to Defendants, a true copy of which is attached as Exhibit 6, hereto.

136.    Notwithstanding both constructing and actual notice of the Asman Marks, Defendants have continued to offer their goods and services in commerce using the infringing "CaseRails" mark, and they will continue to do so until enjoined by this court.

**Fourth Cause of Action**
**False Designation of Origin Pursuant to § 43 of the Lanham Act, 15 USC § 1125**

137.    Plaintiff hereby repeats each and every allegation contained in each of the foregoing paragraphs of this Complaint as though fully set forth herein.

138.    The aforesaid infringements of the Asman Marks by Defendant are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Asman, or as to the origin, sponsorship, or approval of the goods, services, or commercial activities of Defendant by Asman, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

139.    Defendant's wrongful acts entitle Asman to damages and injunctive relief pursuant to 15 U.S.C. §§ 1116 and 1117.

140.    Upon information and belief, Defendant's wrongful activities have caused, and, unless enjoined by this Court, will continue to cause, irreparable injury and other damages to Asman, his business, reputation, and his good will in the Asman Marks.

### Fifth Cause of Action
### Common Law Trademark Infringement and Unfair Competition

141.    Plaintiff hereby repeats each and every allegation contained in each of the foregoing paragraphs of this Complaint as though fully set forth herein.

142.    The use of the mark "CaseRails" by Defendants is likely to cause confusion between the Defendants and/or its activities and Asman and his activities, and such

use by Defendants infringes the valuable common law rights of Asman in the Asman Marks.

143.    The Defendants' aforesaid activities also constitute unfair competition with Asman by creating confusion as to the source or sponsorship of the services of Defendant and misappropriates the fine reputation and goodwill of Asman, both as an attorney and as the principal behind the marketing and use of both *CaseWebs*® and *CaseSpace*® software.

144.    Defendants' actions have injured Asman's reputation and goodwill, and diverted from Asman the benefits and good will arising therefrom.

145.    Defendants' wrongful acts have damaged Asman in an amount to be determined at time of trial.

146.    Defendants have been on actual notice of the Asman Marks and registrations, as well as the *CaseWebs*® and *CaseSpace*® software and associated websites, whereby Defendants have acted knowingly and willfully, whereby Asman is entitled to actual and punitive damages, in an amount to be proven at trial.

147.    Defendants' wrongful acts have irreparably injured Asman, and threaten to continue to irreparably injure Asman, unless and until said acts are enjoined by this Court, as Asman has no adequate remedy at law.

148.    Upon information and belief, Defendants' wrongful activities have caused, and, unless enjoined by this Court, will continue to cause, irreparable injury and

other damages to Asman, his business, reputation, and his good will in the Asman Marks.

## Sixth Cause of Action
## Common Law Conspiracy

149.     Plaintiff hereby repeats each and every allegation contained in each of the foregoing paragraphs of this Complaint as though fully set forth herein.

150.     In the Solicitation Email, Dykema refers to the entity behind the CaseRails software as "CaseRails".

151.     On their LinkedIn pages Dykema refers to himself as "CEO and Co-Founder of CaseRails" while Zeller refers to himself as "COO & Co-Founder CaseRails".

152.     On the CaseRails website, there is no mention of Defendant DocRails, Inc.

153.     Neither the Secretary of State of New York, nor the Secretary of State of Delaware list any corporation or limited liability company having the name "CaseRails".

154.     Notwithstanding the foregoing, the Refusal Letter names Defendant DocRails, Inc. as the entity refusing to honor Asman's long established trademark rights.

155.     Both Dykema and Zeller are attorneys whereby they are, or should be, aware that they were misleading the public at large, and Asman, in particular, by

their use of the fictitious name "CaseRails" as the entity behind the marketing of the CaseRails software.

156.     A search of the "Whois" domain for "caserails.com" shows that the domain was registered anonymously.

157.     All of the foregoing deceptive practices were intended to hide and obfuscate the true party or parties behind the infringement of the Asman Marks, whereby all of the Defendants have acted and taken part in a common law conspiracy, whereby they are each, individually and collectively, liable for all damages awarded to Asman in this matter.


## PRAYER FOR RELIEF

**WHEREFORE**, Asman prays that:

A.     Defendants, individually and collectively, theirs officers, employees, agents, suppliers, web hosts, domain Registrar and all those acting in concert with them be permanently restrained and enjoined from using the mark "CaseRails" or any other colorable imitation of the Asman Marks.

B.     Defendant, and anyone associated with them, their respective officers, employees, agents, suppliers, and all those acting in concert with them be permanently restrained and enjoined from infringing the Asman Marks.

C.      Defendants, and anyone associated with them, their respective officers, employees, agents, suppliers, and all those acting in concert with them be permanently restrained and enjoined from using the domain name "caserails.com" or any other domain name which is a colorable infringement of the Asman Marks, and they should be required to transfer that domain to Asman.

D.      A judgment in favor of Asman and against Defendant for the full value of Defendant's profits, together with the damages of Asman, including lost profits, in an amount to be determined.

E.      The amount of any judgment be trebled pursuant to 15 U.S.C. § 1117, due to the willful infringement of the Asman Marks by Defendants.

F.      The costs of this action and Asman's reasonable attorney's fees, including the value of Asman's services, be taxed against the Defendants, in accordance with 15 U.S.C. § 1117.

G.      All advertising materials, brochures, handouts, source code, or any other materials containing the Asman Marks, or any colorable imitation thereof, including, but not limited to "CaseRails" and the "caserails.com" domain", or any other similar mark be accounted for, and delivered to Asman for such disposal and/or destruction as Asman may exercise pursuant to 15 U.S.C. § 1118.

H.      For a permanent injunction, pursuant to 15 U.S.C. § 1116 against Defendants and anyone associated with them, as well as each of their officers,

agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the Order by personal service or otherwise from:

(1)     Using the Asman Marks (however spelled, whether capitalized, abbreviated, singular or plural, printed or stylized, whether used alone or in combination with any word or words, and whether used in caption, text, orally or otherwise); or any reproduction, counterfeit, copy, colorable imitation or confusingly similar variation of the Asman Marks as a trade name, trademark or service mark, or in any other manner which suggests in any way that Defendant and/or its activities originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Asman, or that Asman and/or his activities are affiliated in any way with Defendant;

(2)     Infringing the Asman Marks or any colorable imitation thereof;

(3)     Using in connection with his activities any false or deceptive designation, representation, or description of Asman or the Asman Marks, whether by symbols or words or statements, which would damage or injure Asman or give Defendant an unfair competitive advantage in the marketplace;

(4)     Using any internet web site or domain name or metatag which includes the Asman Mark or any similar marks, including, but not limited to "CaseRails" (whether capitalized or not);

(5)     Purchasing or using any searchable key words which include the Asman Marks or any colorable imitation thereof, including, but not limited to "CaseRails";

(6)     Engaging in acts of state or common law trade name infringement, trademark infringement, service mark infringement, unfair competition or misappropriation that would damage or injure Asman;

(5)     Diluting the trade name and trademarks of Asman;

(6)     Inducing, encouraging, aiding, abetting or contributing to any of the aforesaid acts.

I.     For an award of all profits derived from Defendant's unlawful acts set forth herein, in an amount to be proven at time of trial, but not less than $75,000.

J.     For an award of treble damages pursuant to 15 U.S.C. § 1117.

K.     For an award of punitive damages, in an amount to be proven at trial.

L.     That Asman be awarded the costs of this civil action, together with Asman's reasonable attorney fees, including the value of services provided by Asman, pursuant to 15 U.S.C. § 1116 and/or 15 U.S.C. § 1117.

M.     For such other and further relief as this honorable Court may deem equitable and proper.

**Undersigned certifies compliance with LR 7.1D (Times New Roman 14).**

**PURSUANT TO RULE 38(b) OF THE FEDERAL RULES OF CIVIL**

**PROCEDURE, TRIAL BY JURY IS DEMANDED.**

Dated: __May 22, 2015__          By:_/s/ Sanford J. Asman_____
                                                           Sanford J. Asman
                                                           Georgia Bar No. 026118
                                                           Plaintiff, *pro se*

Law Office of Sanford J. Asman
570 Vinington Court
Atlanta, Georgia  30350-5710
Phone   :   (770) 391-0215
E-mail  :   sandy@asman.com

## EXHIBITS

1.  U.S. Trademark Reg. No. 3,316,614 ("the '614 Registration") for the mark *CaseWebs*®

2.  U.S. Trademark Reg. No. 3,575,917 ("the '917 Registration") for the mark *CaseSpace*®

3.  Final Order and Injunction in Sanford J. Asman v. Integrated Imaging, LLC,  Case No. 1-11-cv-4206-RWS, U.S. District Court, Northern District of Georgia.

4.  U.S. Trademark Reg. No. 4,144,587 ("the '587 Registration") for the mark CaseWorks Web®

5.  Solicitation Email of May 8, 2015

6.  Cease and Desist Letter dated May 8, 2015